JS 44 (Rev 3/99)

# ORIGINAL CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM)

## I. (a) PLAINTIFFS

UNITED BROTHERHOOD OF CARPENTERS PENSION TRUST, Individually and on Behalf of All Others Similarly Situated

### DEFENDANTS

MICHAELS STORES, INC, R. MICHAEL ROULEAU, BRYAN M DECORDOVA, DUANE E HIEMENZ, RICHARD C MARCUS, THOMAS C. DECARO, JAMES F. TUCKER, EDWARD F SADLER and ROBERT M SPENCER

(b) County of Residence of First Listed Plaintiff __Los Angeles__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant __Dallas__
(IN U S PLAINTIFF CASES ONLY)
NOTE  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

(c) Attorney's (Firm Name, Address, and Telephone Number)
Joe Kendall
Provost ★ Umphrey Law Firm, L.L.P.
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204

RECEIVED
FEB - 4 2003

Attorneys (If Known)

3-03CV0246-M

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- X 3 Federal Question (U S Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 22 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med  Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R R & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl  Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | X 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl  Ret  Inc  Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- X 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U S  Civil Statute under which you are filing and write brief statement of cause  Do not cite jurisdictional statutes unless diversity)

## VII. REQUESTED IN COMPLAINT:
X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  X Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE  2/04/03
SIGNATURE OF ATTORNEY OF RECORD  Joe Kendall

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUN _____  APPLYING IFP _____  JUDGE _____  MAG JUDGE _____

**ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED BROTHERHOOD OF CARPENTERS PENSION TRUST, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. |
| | § | CLASS ACTION |
| Plaintiff, | § § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAELS STORES, INC., R. MICHAEL ROULEAU, BRYAN M. DeCORDOVA, DUANE E. HIEMENZ, RICHARD C. MARCUS, THOMAS C. DeCARO, JAMES F. TUCKER, EDWARD F. SADLER and ROBERT M. SPENCER, | § § § § § § § | |
| | § | |
| Defendants. | § | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## INTRODUCTION AND SUMMARY OF THE ACTION

1.     This is a securities fraud class action on behalf of purchasers of Michaels Stores, Inc. ("Michaels Stores" or the "Company") stock between August 8, 2002 and November 7, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Michaels Stores is a national specialty retailer which provides craft ideas and supplies for hobbyists.  As of March 2002, the Company owned and operated 708 Michaels retail stores in the continental U.S. and Canada, which stores sell do-it-yourself home decorator products and arts and crafts supplies.   Throughout the Class Period, the Company also owned and operated approximately 142 Aaron Brothers stores, primarily on the West Coast, which stores offer photo frames, custom framing services and a wide selection of art supplies. In addition, the Company also owns and operates Star Wholesale, a single-store wholesale operation located in Dallas, Texas, offering merchandise primarily to interior decorators/designers, wedding/event planners, florists, hotels, restaurants and commercial display companies.

3.     During the Class Period, defendants repeatedly represented that Michaels Stores' financial condition was strong and that the Company was increasing its market share and would continue to do so in the foreseeable future.  The Company was persistent in its claims despite a known downturn in the consumer-goods markets and a very, very difficult earnings environment. In fact, throughout the Class Period, defendants consistently appeared at analyst conferences and in other public forums and made very positive statements about Michaels Stores that conditioned investors to believe that: (i) as a result of Michaels Stores' unique combination of assets and market condition, the Company was poised to continue growth and acceleration of market share, despite, or rather as a result of, very difficult market conditions; (ii) despite market conditions that were resulting in downward revisions at Michaels Stores' competitors, the Company was not in danger of failing to meet Company-sponsored expectations for revenue growth; and (iii) the Company's phenomenal second quarter 2002 results were caused by Michaels Stores' strong operating performance.

4.     Thus, rather than admit, throughout the Class Period, that Michaels Stores was *already* experiencing a severe downturn in its store profits and earnings per share, and was also being adversely affected by the same market conditions which were hurting virtually all of the Company's competitors, defendants stated:

- Michaels Stores had established itself as *a specialty retailer that dominated its category* (arts and crafts).

- *A multi-year investment program in sophisticated distribution and information systems was beginning to pay off in a big way*, as evidenced by the huge upside earnings surprises reported in recent quarters.

- Michaels Stores *was able to overcome adverse market conditions due to its unique attributes and market abilities and*, as a result, the Company's earnings power far exceeded its then current levels.

- Although shares of Michaels Stores stock were increasing in price throughout the Class Period, trading near their 52-week high, shares of the Company *remained conservatively valued*, and represented a growth investment for shareholders.

- The Company was exceeding guidance sponsored by defendants and Michaels Stores shares were likely to outperform the market as a result of defendants' unique management abilities, the increase in productivity resulting from recent systems and infrastructure upgrades and the Company's strong earnings momentum.

5.     What investors could not, and did not, know at the time defendants announced second quarter 2002 results – *which purported to show a stellar 359% increase in net income and a 329% increase in earnings per share* – was that defendants had been able to achieve these phenomenal results only by fully utilizing a $14.8 million "markdown reserve" previously recorded in the fourth quarter 2001 "to offset the liquidation of certain merchandise that did not conform to each store's specific plan-o-gram SKU program." Defendants had realized a $14.8 million markdown reserve, without saying a thing about it when announcing the Company's financial results for the second quarter 2002 on or about August 28, 2002. In fact, defendants only disclosed that the $14.8 million reserve was recognized to offset the liquidation of merchandise later when the Company filed its Form 10-Q with the SEC on or about September 17, 2002. Taking advantage of this misleading omission, *defendants unleashed a wave of over $15.3 million of insider selling* while in possession of material adverse non-public information.

6.     In addition to concealing that it was the severe reversal of markdown reserves that padded the Company's second quarter 2002 results, defendants also concealed that the Company was

suffering from a host of undisclosed adverse factors which were negatively impacting its business and ensuring that Michaels Stores would report declining earnings and revenues during the next quarter. Thus it was only on November 7, 2002, when the Company released results for its third quarter 2002, that investors learned the following:

- Defendants' claims that Michaels Stores' purported "record setting" growth was the result of systems and/or infrastructure upgrades, or any other improvements made by defendants, were false, as the Company was then witnessing declining prospects, and the Company had achieved this "record setting" performance only by engaging in illicit accounting mechanizations and gimmicks to artificially inflate margins, net income and earnings.

- Many of Michaels Stores' customers were already curtailing their spending for hobby and entertainment – or discretionary purchases – by the inception of the Class Period and, as a result, Michaels Stores was experiencing the same adverse market conditions which were negatively impacting the Company's competitors, and, as such, defendants did not possess any proprietary formula or business model that would allow the Company to achieve results which outpaced or outperformed the market.

- The Company was not "in great shape," it did not have "considerable momentum" and was not proceeding according to guidance sponsored or provided by defendants.

- The clandestine reserve accrual in the second quarter 2002 had the effect of artificially inflating the gross margins of goods during the second quarter (since the margin on the incremental piece of inventory which was liquidated to offset the reserve effectively had a zero cost basis) and therefore added 100% to Michaels Stores' reported margin improvement.

- Notwithstanding defendants' efforts to create the materially false impression that the Company had achieved record results in the fiscal second quarter, the truth was that Michaels Stores was *already* suffering from the same adverse market conditions other retailers were experiencing.

7.     In all, during the Class Period, at the time that Michaels Stores was being adversely affected by the aforementioned factors, but prior to any disclosure to the market, certain of the defendants sold more than $15.3 million worth of their personally held Michaels Stores common stock to the unsuspecting public, while in possession of material adverse information. In fact, the CEO and President of the Company, defendant Rouleau, himself sold over 125,000 shares of his privately held Company shares during the Class Period to reap over $5.8 million in illegal profits. And certain senior officers and/or directors *sold 100% of their Michaels Stores holdings during this short period of time* – the very time the Company was regularly appearing at analysts' and investor conferences and relentlessly issuing press releases telling investors that Michaels Stores was not

- 3 -

being adversely affected by current market conditions which were already negatively affecting Michaels Stores' competitors.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act [15 U.S.C. §78aa].

10.      Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b). Michaels Stores maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.      Plaintiff United Brotherhood of Carpenters Pension Trust, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Michaels Stores at artificially inflated prices during the Class Period and has been damaged thereby.

13.      Defendant Michaels Stores is a Delaware corporation with its principal place of business at 8000 Bent Branch Drive, Irving, Texas 75063. Michaels Stores is a national specialty retailer which provides craft, art supplies and materials through approximately 850 company owned and operated Michaels Stores (708 stores at March 2002) and Aaron Brothers stores (142 stores at March 2002) located primarily on the West Coast. Defendant Michaels Stores may be served with process by serving its registered agent for service of process, CT Corp., at 350 N. St. Paul Street, Dallas, Texas 75201.

14.      Defendant R. Michael Rouleau ("Rouleau") is, and at all times relevant to the allegations raised herein was, President and CEO of Michaels Stores. During the Class Period, while

in possession of material adverse, non-public information, defendant Rouleau sold over 125,000 shares of his privately held Michaels Stores stock to reap over **$5.83 million** in illicit gross proceeds. Defendant Rouleau may be served with process at Michaels Stores, Inc., 8000 Bent Branch Drive, Irving, Texas 75063.

15.     Defendant Bryan M. DeCordova ("DeCordova") was, until his sudden retirement from the Company, at all times relevant to the allegations raised herein, Chief Financial Officer of Michaels Stores.  He may be served with process at 319 Martel Lane, Coppell, Texas 75019.

16.     The defendants listed below (collectively with Rouleau, the "Selling Defendants") are senior officers and/or directors of the Company who sold stock during the Class Period while in possession of material adverse information in the amounts indicated below:

| Name | Position | No. Shares Sold | Gross Proceeds | % of Stock Holdings Sold |
|---|---|---|---|---|
| Duane E. Hiemenz ("Hiemenz") | Officer | 61,668 | $2,848,444 | 90.7% |
| Richard C. Marcus ("Marcus") | Director | 50,000 | 2,136,018 | 41.67% |
| Thomas C. DeCaro ("DeCaro") | Officer | 34,999 | 1,582,305 | 100.00% |
| James F. Tucker ("Tucker") | Exec. V.P. | 33,333 | 1,517,985 | 63.61% |
| Edward F. Sadler ("Sadler") | Exec. V.P. | 20,000 | 920,634 | 25.26% |
| Robert M. Spencer ("Spencer") | Exec. V.P. | 10,166 | 480,889 | 100.00% |
| **TOTAL** | | **210,166** | **$ 9,486,275** | |
| **Total Including Rouleau** | | **335,166** | **$15,319,716** | |

Defendants Hiemenz, Marcus, DeCaro, Tucker, Sadler and Spencer may be served with process at Michaels Stores, Inc., 8000 Bent Branch Drive, Irving, Texas 75063

17.  The defendants referenced above in ¶¶14-16 are referred to herein as the "Individual Defendants."  It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the

- 5 -

narrowly defined group of defendants identified above. Each of the above officers and/or directors of Michaels Stores, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

17. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18. As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained

of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Michaels Stores, each of the Individual Defendants had access to the adverse undisclosed information about Michaels Stores' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Michaels Stores and its business issued or adopted by the Company materially false and misleading.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

21.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Michaels Stores common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Michaels Stores' business, operations, management and the intrinsic value of Michaels Stores common stock; (ii) enabled the Selling Defendants to sell more than $15.3 million worth of their personally held Michaels Stores common stock while in possession of material adverse information to the unsuspecting public; and (iii) caused plaintiff and other members of the Class to purchase Michaels Stores common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired the common stock of Michaels Stores between August 8, 2002 and November 7, 2002, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Michaels Stores common shares were actively traded on the NYSE. As of September 10, 2002, the Company had over 67 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Michaels Stores or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

24.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Michaels Stores; and

- 8 -

(c)     to what extent the members of the Class have sustained damages and the

proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs

done to them.  There will be no difficulty in the management of this action as a class action.

**DEFENDANTS' SCHEME AND WRONGFUL
COURSE OF BUSINESS**

28.     On August 8, 2002, defendants issued a release announcing that July sales had surged

a purported 20% and, as a result of the Company's continued financial success, Michaels Stores was

increasing its second quarter estimates, as follows:

> Michaels Stores, Inc. July Sales Surge 20% – Same-Store Sales Up 11% – ***Company
> Raises 2nd Quarter Earnings Estimates.***
>
> ... Michaels Stores, Inc. today reported that total sales for the month of July
> increased 20% to $191.4 million from $159.4 million for the same period last year.
> ***Same-store sales for the month increased 11%, three percentage points higher
> than previously forecast. Total sales for the second quarter increased 19%*** to
> $576.7 from $486.1 for the same period last year....
>
> [Defendant] Rouleau ... said, ***"We are very pleased with our continuing
> performance. The investments we have made in our systems and infrastructure are
> really starting to pay off, and we're in great shape as we enter the fall and holiday
> seasons.  We remain very optimistic and we have considerable momentum as we
> head into the third quarter."***
>
> ***On the strength of these higher sales, the Company has raised its earnings
> estimates per diluted share by $.02 to $.18 for the second quarter and $1.94 for the
> full fiscal year***.  This increase comes on the heels of a $.05 increase in earnings
> guidance made last month.  The Company also repurchased 392,000 shares of its
> Common Stock during the past month.

In addition to the foregoing, defendants also used this release to condition investors to believe that

the Company was in compliance with all of its reporting obligations and that its financial statements

conformed with Generally Accepted Accounting Principles ("GAAP") and that its guidance was

reasonable, as follows:

> Pursuant to a recent directive of the Securities and Exchange Commission
> relating to public companies with annual revenues greater than $1.2 billion, senior
> officers of the Company will be required to file written statements, under oath,

- 9 -

regarding the accuracy of the Company's financial statements and their consultation with the Company's Audit Committee. In light of the Company's fiscal calendar, the Company is required to and will file such statements with the Commission by the close of business on September 17, 2002.

29.   After the publication of the Company's market-reassuring August 8, 2002 release, the price of Michaels Stores common stock surged from a close of $34.10 per share on August 7, 2002, to a high of $37.50 per share on August 8, 2002, and within five trading sessions shares of Michaels Stores stock traded at over $41.50 in reaction to this extremely favorable news.

30.   Based on defendants' false public statements as well as information provided in one-on-one follow-up conversations, following the release of the Company's results on August 8, 2002, and the share price rally that followed, analysts issued "Buy" and "Strong Buy" ratings on shares of Michaels Stores stock, as follows:

| Brokerage | Rating | Target | Date | Comments |
|-----------|--------|--------|------|----------|
| Commerce Capital | Strong Buy | $48 | 8/08/02 | Traffic & Average Ticket Gains Drive Comps |
| SWS Securities | Strong Buy | $50 | 8/08/02 | SWS Reiterates Strong Buy Rating |
| Suntrust | BUY | $51 | 8/08/02 | Raising Estimates after Robust July |
| Wedbush Morgan | BUY | $47 | 8/08/02 | Michaels Stores Reported Impressive July |

31.   On August 28, 2002, Michaels Stores issued a release which purported to announce a record setting second quarter 2002, with "record" second quarter earnings. Net income soared an amazing 359%. EPS climbed a remarkable 329%. Purported earnings were $0.11 per share *above* consensus estimates. In addition, this release stated, in part, the following:

Michaels Stores, Inc. today reported *record financial results for its second quarter* and the six months ended August 3, 2002. Net income for the quarter was $21.5 million, *a 359% increase compared to net income* of $4.7 million in the same period last year. *Earnings per share were $.30, 329%* or $.23 higher than last year's $.07 and $.11 higher than analysts' consensus.

Net income for the six months ended August 3, 2002 was $42.1 million, *a 252% increase* compared to net income of $12.0 million last year. Earnings per share were $.60, an increase of 233% over last year's $.18 per share.

- 10 -

Total sales for the second quarter increased 19% to $576.6 million from $486.1 million for the same period last year. Year-to-date sales of $1.180 billion increased 17% from $1.011 billion for the same period last year. Same-store sales were up 9% for the quarter and 7% year-to-date.

\* \* \*

[Defendant] Rouleau ... said, *"We are very, very pleased with our second quarter record sales and profit performance. We continue to build upon the momentum that we have generated over the last five years*. And, as we have consistently stated in the past, while *we are very pleased with our current financial performance, the real sales and profit benefits of the significant investments we have made in our infrastructure are still ahead of us and give us great confidence in our future."*

Defendants also used this release to condition investors to believe that the Company was on track to meet third quarter guidance and that August sales were "much stronger than expected." In addition to the foregoing, the release stated:

The Company also reported that *August sales are coming in much stronger than expected*, and it is now projecting a same-store sales increase of 5% to 6% for the month, up from their prior guidance for flat same-store sales.

32. The statements contained in the Company's August 8, 2002 and August 28, 2002 releases referred to above in ¶¶29 and 32, were each materially false and misleading when made. Each statement misrepresented and/or omitted to disclose the following adverse facts and conditions which defendants knew existed at that time, or recklessly disregarded, the disclosure of which was necessary to make such statements not false and/or misleading, including that:

(a) Defendants' claims that Michaels Stores' purported "record setting" growth was the result of systems and/or infrastructure upgrades, or any other improvements made by defendants, were false. Throughout the Class Period the Company was witnessing declining prospects. Defendants had achieved "record setting" results only by engaging in illicit accounting mechanizations and gimmicks to artificially inflate margins, net income and earnings;

(b) Many of Michaels Stores' customers were already curtailing their spending for hobby and entertainment – or discretionary purchases – by the inception of the Class Period. As a result, Michaels Stores was experiencing the same adverse market conditions which were negatively impacting the Company's competitors. Contrary to defendants' representations, they did

- 11 -

not have any formula or business model that would allow the Company to achieve results which outpaced or outperformed the market;

(c)     The clandestine reserve accrual in second quarter 2002 had the effect of artificially inflating the gross margins of goods during the second quarter (since the margin on the incremental piece of inventory which was liquidated to offset the reserve effectively had a zero cost basis) and therefore added 100% to Michaels Stores' reported margin improvement;

(d)     Notwithstanding defendants' efforts to create the materially false impression that Michaels Stores had achieved record results in the fiscal second quarter, the truth was that the Company was *already* suffering from the same adverse market conditions other retailers were experiencing;

(e)     By the inception of the Class Period, Michaels Stores was not performing according to guidance sponsored by defendants, and it was not reasonably foreseeable that the Company would achieve forecasted earnings or income estimates going forward. Defendants lacked all reasonable basis at the time upon which to ground such guidance or estimates; and

(f)     By the inception of the Class Period, it was wholly false for defendants to claim that they were "pleased with [their] current financial performance," knowing that the second quarter 2002 financial results were a hoax. At that time, defendants knew they did not have "great confidence in [the] future," and that the Company did not have continued "momentum." In addition, Michaels Stores was not proceding according to Company-sponsored guidance, and there was no reasonable basis upon which defendants could feign optimism about the Company's future financial performance.

33.     The materially false and misleading statements issued by the defendants in the quarterly earnings announcement had their intended effect. Again shares of Michaels Stores rallied, trading up over $5 per share, to close trading on August 29, 2002 at $45.21 per share.

34.     Also following the publication of the Company's August 8, 2002 and August 28, 2002 releases, analysts issued very positive recommendations on Michaels Stores. Issuing "Strong Buy" opinions and near-term price targets as high as $61 per share, these analysts recommended that their customers purchase shares of Michaels Stores, as follows:

- 12 -

- **SWS Securities (Aug. 8, 2002; O. Tangun): STRONG BUY, Price Target of $50.00**

The Company reported an 11% same store sales increase in July, better than our estimate of a[n] 8% increase. Total sales were $191.4 million, up 20% from the same period a year ago. Management raised 2Q 02 EPS guidance to $0.18 from $0.16. This comes after management increased EPS guidance $0.05 last month. *We will review our FY02 estimate and believe there is upside to our numbers. We are reiterating our Strong Buy rating and maintaining our 12-month price target of $50 based on 22x our FY03 EPS of $2.26.*

- **CS First Boston (Aug. 13, 2002; G. Balter): BUY, Price Target of $50.00**

*Sales Continue To Buck The Trend*

\* \* \*

MIKs July comps (up 11%) showed uncommon strength against a backdrop of high-profile misses and a larger retail spending slowdown in the second half of July.

*We are raising our EPS estimates to reflect the strong sales and increased company guidance.*

\* \* \*

Michael's dominant position in the craft and hobby category positions it attractively in a potential consumer slowdown; as we have said, MIK's sales do not show a strong correlation with the housing market, and we believe the current sales strength in the category which WMT highlighted once again in its weekly sales report for the first week of August is indicative of its resistance to larger fluctuations in more impulse-driven spending.

- **Commerce Capital Markets (Aug. 29, 2002; R. Zimmerman): STRONG BUY, Price Target of $50**

*Michaels Stores Results Far Exceed Q2 Expectations*
*Q3 Tracking Above Plan*

\* \* \*

*We remain confident in management's ability to execute, as well as continued consumer interest in arts and crafts.* We maintain our Strong Buy and are raising our 12-month target price from $48 to $50 per share.

- **Wedbush Morgan Securities (Aug. 29, 2002; J. Bogucki-Storms): BUY, Price Target of $61**

*Michaels Stores reported stellar Q2 EPS of $0.30, beating our estimate and consensus by an impressive $0.11; increasing our estimates and price target; Reiterating our BUY rating.*

\* \* \*

- 13 -

We believe that the current strong sales momentum and operational execution is likely to continue into 2H, although we are forecasting comps to moderate from recent levels as they face tougher comparisons. However, we expect MIK at least to meet our recently upward revised estimates. *We believe that the company has good operating-margin expansion potential for the longer term, as it continues to benefit from systems investments and better merchandising as well as favorable demographics.*

- **C.L. King & Associates (Aug. 29, 2002; W. Armstrong): STRONG BUY; Target Price of $54.00**

*Q2 Results Blow Away Expectations; Raising Estimate.*

\*   \*   \*

Q2 gross margins expanded by 329 basis points to 36.1% of sales. Better merchandise margins driven by more full-priced sales contributed approximately 200 basis points, while occupancy expense leverage and lower store closing costs account for the rest. We had been projecting only a 40-basis point improvement, so this was a startling increase and the single biggest source of the upside earnings surprise.

\*   \*   \*

MIK is one of the very few retailers to actually beat its sales plans since last September. Sales have been strong across the board in both basic and seasonal categories....

*MIK is therefore showing strong defensive characteristics (in addition to being an attractive growth story). We believe MIK is better insulated from economic downturns than are most retailers because it is generally less costly for a consumer to do a craft project than to buy a comparable finished product.*

- **Sanders Morris Harris (Aug. 29, 2002; D. Brunello): BUY; Price Target of $56**

*MIK: Blows Through Expectations ... Again! Increasing Estimates, Reiterate BUY*

\*   \*   \*

\*   We believe Michaels is well positioned to continue its strong sales and earnings performance.

35. On September 5, 2002, the Company issued another release. This release purported to announce that Michaels Stores August sales improved an additional 12% with a same-store sales increase of 6%. For the month of August 2002 purported sales increased 12%, to $174.1 million, from $155.4 million for the same period in 2001. Year-to-date sales of $1.354 billion for fiscal 2002 increased 16% from $1.166 billion for the same period last year while same-store sales were up 7% year-to-date.

- 14 -

36.     The same day defendants released these excellent monthly sales results, *SmartMoney.com* published a report on the Company entitled, "***We Love a Surprise***." This story highlighted the fact that Michaels Stores had seemingly outperformed otherwise negative market conditions to achieve very positive results, in part, as follows:

> If you're any kind of market watcher, you know how hard it's been to whistle a chipper tune lately. Tuesday's 355-point, or 4.1%, drop in the Dow Jones Industrials certainly didn't inspire any spontaneous renditions of "Happy Days Are Here Again." And after Thursday's 141-point drop, the Dow sat 17.5% lower for the year. As for the other broad indexes, well, they aren't faring much better.

> But ***despite the recent dreariness, a few companies have sounded some delightfully cheery notes. Take arts-and-crafts retailer Michaels Stores***. Last Wednesday it posted a 12-cent-per-share earnings surprise for the second quarter, 67% better than Wall Street expected. Michaels' stock? It jumped 13.7% on the news.

37.     At the same time the *SmartMoney.com* report was published, *CBS Marketwatch* also issued a similar report which stated that August was a "slow" month for U.S. retailers, with "decidedly lackluster sales results reported by many of the nation's retailers" and "most department store chains [coming] in with August same-store sales results below Wall Street's consensus, as did retailing giant Wal-Mart Stores and the majority of apparel retailers." *CBS Marketwatch* too, highlighted the fact that ***Michaels Stores was one of the "few bright spots... amid the retailing gloom."***

38.     The materially false and misleading statements issued by the Company had their intended effect. As evidence of this, on September 9, 2002, H.C. Wainwright & Co. initiated coverage of the Company with an "OUTPERFORM" rating and published a report which stated, in part, the following:

> *       Michaels Stores has established itself as ***a specialty retailer that dominates its category*** (arts and crafts) perhaps more than any other company in retailing.

> *       ***A multi-year investment program in sophisticated distribution and information systems is beginning to pay off in a big way***, as evidenced by the huge upside earnings surprises reported in recent quarters.

> *       Following the release of 2Q02 results on August 28[th], we believe that Michaels' ***earnings power is far greater than current levels.***

- 15 -

* Although the shares of MIK are trading near their 52-week high, the *stock remains conservatively valued*, in our opinion, at only 18.7x our 2003 EPS estimate.

* *We are initiating coverage of Michaels Stores with an Outperform rating*.

39. While investors had no way of knowing this at the time, and as defendants did their best to ensure that investors would not know the true financial condition of the Company, during the Class Period defendants were already taking measures to lessen the inevitable adverse impact which the belated disclosure of the true financial condition of the Company would ultimately have on the price of Michaels Stores common stock. Thus, on September 12, 2002, defendants issued a release which announced that they had increased the Company's stock repurchase program, which would authorize defendants to purchase an additional 1.55 million shares of Michaels Stores common stock in the open market. This release also stated the following:

> Michaels Stores, Inc. announced today that its Board of Directors has approved a repurchase of up to an additional one million shares of the Company's Common Stock under its Stock Repurchase Program. This brings the total shares available to be repurchased to 1.558 million. These repurchases will be made from time to time, as market conditions warrant, in the open market or in negotiated transactions, and will be funded from available working capital and cash flow from operations.

> [Defendant] Rouleau ... said, "*We are pleased to announce the continuation of our repurchase program. We do not currently expect share repurchases to be made prior to the fourth quarter of this fiscal year, unless, of course, market conditions encourage us to act sooner*."

> Since July 1999 the Company has repurchased approximately 11.4 million shares of its Common Stock and currently has approximately 66.5 million shares outstanding.

40. Immediately after this release was issued by the Company, on September 12, 2002, *TheStreet.com* Senior Columnist Herb Greenberg published his reaction, which was that, ostensibly, Michaels Stores picked an "odd time for a buyback," in addition to stating the following:

> Thursday thwack:

> Messing with Michaels: Michaels Stores, an active buyer of its own stock, today authorized the repurchase of an additional 1 million shares from time to time, on the open market or in negotiated transactions. The additional buybacks, Michaels said, won't take place until the fourth quarter (starting in November), unless market conditions change.

41. *At the same time defendants were announcing an expanded Company share buy-back, during the first two weeks of September they were dumping their own shares into the market*

- 16 -

*while in possession of the knowledge that gross margins had been artificially inflated in the second quarter and that this margin improvement could not be maintained.*  Such illicit insider stock sales included the following :

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| **DECARO** | 09/03/02 | 34,999 | $ 45.210 | $ 1,582,305 |
| | | **34,999** | | **$ 1,582,305** |
| **HIEMENZ** | 09/04/02 | 1,000 | $ 46.050 | $       46,050 |
| | 09/04/02 | 49,002 | $ 46.000 | $ 2,254,092 |
| | 09/06/02 | 11,666 | $ 47.000 | $     548,302 |
| | | **61,668** | | **$ 2,848,444** |
| **ROULEAU** | 09/04/02 | 4,200 | $ 46.100 | $     193,620 |
| | 09/04/02 | 21,900 | $ 46.000 | $ 1,007,400 |
| | 09/04/02 | 2,000 | $ 46.090 | $       92,180 |
| | 09/04/02 | 3,600 | $ 46.070 | $     165,852 |
| | 09/04/02 | 2,000 | $ 46.140 | $       92,280 |
| | 09/04/02 | 3,000 | $ 46.200 | $     138,600 |
| | 09/04/02 | 500 | $ 46.060 | $       23,030 |
| | 09/04/02 | 4,100 | $ 46.010 | $     188,641 |
| | 09/04/02 | 200 | $ 46.020 | $         9,204 |
| | 09/04/02 | 1,000 | $ 46.110 | $       46,110 |
| | 09/04/02 | 2,800 | $ 46.080 | $     129,024 |
| | 09/04/02 | 2,200 | $ 46.040 | $     101,288 |
| | 09/04/02 | 2,500 | $ 46.030 | $     115,075 |
| | 09/06/02 | 7,500 | $ 48.450 | $     363,375 |
| | 09/06/02 | 1,200 | $ 48.370 | $       58,044 |
| | 09/06/02 | 4,900 | $ 48.010 | $     235,249 |
| | 09/06/02 | 2,200 | $ 47.510 | $     104,522 |
| | 09/06/02 | 2,500 | $ 48.170 | $     120,425 |
| | 09/06/02 | 5,000 | $ 48.250 | $     241,250 |
| | 09/06/02 | 10,100 | $ 48.000 | $     484,800 |
| | 09/06/02 | 100 | $ 47.580 | $         4,758 |
| | 09/06/02 | 200 | $ 47.530 | $         9,506 |
| | 09/06/02 | 3,200 | $ 48.350 | $     154,720 |
| | 09/06/02 | 2,500 | $ 47.750 | $     119,375 |
| | 09/06/02 | 10,000 | $ 47.950 | $     479,500 |
| | 09/06/02 | 600 | $ 48.360 | $       29,016 |
| | | **100,000** | | **$ 4,706,844** |
| **SPENCER** | 09/03/02 | 2,000 | $ 45.270 | $       90,540 |
| | 09/05/02 | 2,000 | $ 46.250 | $       92,500 |
| | 09/06/02 | 2,000 | $ 47.250 | $       94,500 |
| | 09/09/02 | 2,000 | $ 48.250 | $       96,500 |
| | 09/11/02 | 2,166 | $ 49.330 | $     106,849 |
| | | **10,166** | | **$     480,889** |

42.     On September 17, 2002, Michaels Stores issued a release in which it announced the certification of the Company's financial results.  This release stated that the Company's Chief Executive Officer, defendant Rouleau, and its Chief Financial Officer, defendant DeCordova, had submitted certifications to the SEC stating that they had complied with both SEC Order 4-460 and the Sarbanes-Oxley Act of 2002.  Compliance with this Act demanded that the financial statements submitted to the SEC were true, accurate and correct.

43.     The same day, September 17, 2002, Michaels Stores filed with the SEC its financial results for second quarter 2002, the period ended August 3, 2002.  This filing reiterated much of the same financial information previously announced on August 28, 2002.  In addition, however, buried in the notes to the Company's financial statements, for the first time, the second quarter 2002 Form 10-Q revealed that defendants had substantially inflated the Company's second quarter gross margins by including in its financial results for the second quarter 2002 at least $14.8 million in "reserve reversals" related to a reserve for impaired inventory taken at the end of the prior year, as follows:

> Cost of sales and occupancy expense, as a percentage of net sales, for the second quarter of fiscal 2002 was 63.9%, a decrease of 3.3% compared to the second quarter of fiscal 2001.  This decrease was primarily attributable to improved merchandise margins and a leveraging of store occupancy expense on higher average net sales per store compared to the second quarter of fiscal 2001.

> In addition, in the second quarter of fiscal 2002, we fully utilized the $14.8 million markdown reserve originally recorded in the fourth quarter of fiscal 2001 to offset the liquidation of certain merchandise that did not conform to each store's specific plan-o-gram SKU program.

44.     The statements contained in the Company's September 17, 2002 release and 10-Q referred to above in ¶¶43-44, were each materially false and misleading when made as they misrepresented and/or omitted to disclose the adverse facts and conditions which defendants knew, or recklessly disregarded, existed at that time, the disclosure of which was necessary to make such statements not false and/or misleading for the reasons stated herein in ¶33, *supra*.

45.     *After meeting with management of the Company*, SWS Securities published a report which reiterated its BUY rating and a $57 price target for shares of Michaels Stores.  In addition, the report stated, in part, the following:

> Yesterday, *we had a very positive meeting with management*.  We are optimistic about the fourth quarter.  We believe that the company is ready earlier for

the holiday season. Combined with the allocation system implemented last year, *we believe there is upside to our 4th quarter comp and earnings estimates*.... We are reiterating our Strong Buy rating and maintaining our 12-month price target of $57 based on 23x our FY03 EPS estimate of $2.48.

46.     On October 10, 2002, Michaels Stores issued a release which purported to announce that September same-store sales climbed 10%, with total sales up 25%. This release also increased third quarter 2002 and full year EPS estimates, and stated the following:

> Michaels Stores, Inc. today reported that same-store sales for the month of September increased 10%, *four percentage points higher than previous expectations.* Total sales for the month increased 25% to $296.1 million from $236.3 million for the same period last year. Same-store sales were up 7% year-to-date while total sales of $1.650 billion for fiscal 2002 increased 18% from $1.402 billion for the same period last year.
>
> [Defendant] Rouleau said, "*We are extremely pleased with our performance in September. While we are sensitive to current concerns about consumer spending, we believe that the significant improvements we continue to make in our operations will continue to propel our same-store sales and profit growth.* We expect same-stores sales for October to increase between 4% to 6% and third quarter same-store sales to increase 6% to 7%. We have also raised our earnings estimates per diluted share to $.40 for the third quarter and $2.10 for the full fiscal year."
>
> *   *   *
>
> As previously reported, the Company's Executive Vice President – Chief Financial Officer, Bryan DeCordova, has announced his resignation effective October 31, 2002. The Company continues a nationwide search for a new CFO. Until a new Chief Financial Officer has been appointed, all financial inquiries should be directed to Chris Holland, Vice President – Finance.

47.     The statements contained in the Company's October 10, 2002 release referred to above in ¶47, were each materially false and misleading when made as they misrepresented and/or omitted to disclose the adverse facts and conditions which defendants knew, or recklessly disregarded, existed at that time, the disclosure of which was necessary to make such statements not false and/or misleading for the reasons stated herein in ¶33, *supra*.

48.     The same day, *Reuters* also reported that Michaels Stores had seemingly forecast third-quarter earnings near the "high-end of Wall Street's estimates, after September sales at stores open at least a year, or same-store sales, increased 10%." Again, *Reuters* reiterated justifications provided by defendants for their trend-beating results, such as the fact that the Company's business had benefitted from a push by Americans to engage more in home-bound activity after last year's September 11 attacks. Also according to *Reuters*, Michaels Stores forecast third quarter profit of

- 19 -

$0.40, and full-year profit of $2.10. Analysts polled by research firm Thomson First Call forecast third quarter profit to range from $0.37 to $0.41, with a mean at $0.39. A year earlier the retailer reported a third quarter profit of $0.28 a share, and a full-year profit of $1.46 a share. For the full-year the analysts' average estimate was $2.12, on estimates ranging from $2.09 to $2.20. Total sales for September purportedly increased 25% to $296.1 million from $236.3 million last year.

49.     As further evidence that the materially false and misleading statements issued by the Company had their intended effect, following the publication of the Company's October 10, 2002 release, analysts issued very positive recommendations on Michaels Stores, issuing "Strong Buy" opinions and price targets as high as $61 per share. The analysts also recommended that customers purchase shares of Michaels Stores, as follows:

- **SWS Securities (Oct. 10, 2002; O. Tangun): STRONG BUY, Price Target of $57.00**

    The company reported a strong 10% same-store sales increase in September, exceeding our mid-single-digit comp estimate. MIK reported a 10% same-store sales increase in the same period last year.... The company increased 3Q02 EPS guidance to $0.40 and FY02 EPS guidance of $2.10. Management indicated the average ticket increased 4% and the average customer transaction was up 6% from last year.... *We are reiterating our Strong Buy rating and increasing our 12-month price target from $54 to $57 based on 23x our FY03 EPS estimate of $2.48.*

- **CS First Boston (Oct. 10, 2002; G. Balter): BUY, Price Target of $55.00**

    MIK reported September same-store sales up 10%, on top of a 10% gain last year – reflecting continued acceleration at MIK even as sales at other retailers lag.

    *Given strong sales in the first two months of Q3, we are raising our comp expectation to 6%, and as a result are raising our 3Q EPS estimate to $0.41 from $0.39. We are also raising our full year 2002 forecast to $2.13 from $2.10 and our 2003 EPS estimate to $2.50 from $2.48.*

- **Wedbush Morgan Securities (Oct. 10, 2002; J. Bogucki-Storms): BUY, Price Target of $61**

Michaels Stores Reported *a Blowout Month as September Comps Increased*

\*   \*   \*

*September Sales Results Are Way above Guidance and Estimates-Again.* Michaels reported another blowout month as September sales increased 25% to $296 million from $236 million LY and September comps increased an impressive 10% compared to a difficult 10% LY, significantly ahead of the guided 4-6% range and our 5% estimate.... Traffic trends continue to be strong .... We believe that the average ticket continues to benefit from increased in-stock levels as a result of ongoing supply chain initiatives.... Sales continued to be solid across all regions,

- 20 -

with the greatest comp increase coming from the Northeast, followed by the Southeast and the West Coast. *We are maintaining our October comp estimate of 5% and increasing our Q3 comp estimate from 5% to 7% based on solid results and revised guidance.*

- **SWS Securities (Nov. 5, 2002; O. Tangun): STRONG BUY, Price Target of $57.00**

The company reports October same-store sales Thursday. *Based on our field research, we believe the company will meet or exceed the high-end of its guidance of 4% to 6% comps.* We are currently modeling a 5% increase in same-store sales.... As a result of the strong seasonal sell-through, we believe there is upside to our margin estimates.

50.    In addition to their prior stock sales, at the same time defendants were guiding the market higher and artificially inflating the price for Michaels Stores shares, defendants continued liquidating their personally held Company shares. These sales included the following:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **MARCUS** | 10/15/02 | 4,500 | $ 42.800 | $ 192,600 |
| | 10/15/02 | 20,000 | $ 42.900 | $ 858,000 |
| | 10/15/02 | 500 | $ 42.820 | $ 21,410 |
| | 10/16/02 | 200 | $ 42.000 | $ 8,400 |
| | 10/17/02 | 5,000 | $ 42.600 | $ 213,000 |
| | 10/17/02 | 6,100 | $ 42.300 | $ 258,030 |
| | 10/17/02 | 5,000 | $ 42.620 | $ 213,100 |
| | 10/17/02 | 4,800 | $ 42.990 | $ 206,352 |
| | 10/17/02 | 3,900 | $ 42.340 | $ 165,126 |
| | | **50,000** | | **$ 2,136,018** |
| **ROULEAU** | 10/18/02 | 400 | $ 45.050 | $ 18,020 |
| | 10/18/02 | 5,800 | $ 45.100 | $ 261,580 |
| | 10/18/02 | 1,500 | $ 45.150 | $ 67,725 |
| | 10/18/02 | 1,000 | $ 45.160 | $ 45,160 |
| | 10/18/02 | 400 | $ 45.110 | $ 18,044 |
| | 10/18/02 | 1,500 | $ 45.120 | $ 67,680 |
| | 10/18/02 | 9,400 | $ 45.020 | $ 423,188 |
| | 10/18/02 | 5,000 | $ 45.040 | $ 225,200 |
| | | **25,000** | | **$ 1,126,597** |
| **SADLER** | 10/21/02 | 2,500 | $ 46.200 | $ 115,500 |
| | 10/21/02 | 100 | $ 46.120 | $ 4,612 |
| | 10/21/02 | 600 | $ 46.010 | $ 27,606 |
| | 10/21/02 | 100 | $ 46.150 | $ 4,615 |
| | 10/21/02 | 15,700 | $ 46.000 | $ 722,200 |
| | 10/21/02 | 300 | $ 46.140 | $ 13,842 |
| | 10/21/02 | 300 | $ 46.130 | $ 13,839 |
| | 10/21/02 | 400 | $ 46.050 | $ 18,420 |
| | | **20,000** | | **$ 920,634** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| **TUCKER** | 10/21/02 | <u>33,333</u><br>**33,333** | $ 45.540 | <u>$ 1,517,985</u><br>**$ 1,517,985** |

## MICHAELS STORES' TRUE FINANCIAL
## CONDITION IS BELATEDLY DISCLOSED

51.     On November 7, 2002, defendants issued a release which disclosed for the first time that the Company was operating *well below guidance* and that Michaels Stores would substantially reduce estimates going forward, in part, as follows:

> Michaels Stores, Inc. today reported that total sales for the month of October increased 6% to $234.5 million from $220.4 million for the same period last year. Same-store sales for the month increased 2%. Total sales for the third quarter increased 15% to $704.6 million from $612.0 million for the same period last year. Same-store sales for the quarter increased 6%. Year-to-date sales of $1.884 billion for fiscal 2002 increased 16% from $1.623 billion for the same period last year while same-store sales were up 7% year-to-date.

> *The Company also reported that it has revised its outlook for the fourth quarter. Noting that the consumer confidence index had fallen to a nine year low, [defendant] Rouleau said, "While we feel we have never been better prepared for the Holiday season, a shift in the retail environment in general and waning consumer confidence has caused us to modify our sales and earnings expectations for the balance of this year.* We are now looking for same-store sales in the fourth quarter to be up one percent versus our previous guidance of up two to three percent. Based on this revised forecast, we expect earnings for the full year to be five cents less per diluted share than our previous guidance of $2.10 per diluted share."

52.     Immediately following the publication of this release, as soon as trading of Michaels Stores began, shares plummeted over 30%, or over $11.18 per share, more than wiping out all gains made during the Class Period, after reporting same-store sales gains for October that were one-third to one-half expectations. According to *CBS Marketwatch*, during the conference call held after the publication of the November 7, 2002 release, defendants blamed a variety of factors for the purported sudden decline, including that: (i) sales were negatively affected by the Maryland-area sniper attacks; (ii) as a result of the media attention over the sniper in Maryland, and because the Company's name was mentioned in the media at the same time and in the same context, this somehow impacted results nationally; (iii) consumers were shifting their shopping resources to winter apparel, rather than arts and crafts; and (iv) customer store traffic fell sharply through October due to restrained consumer

spending amid an uncertain U.S. economy – the Company's first decline in customer traffic in any month this year.

53.     In the conference call that accompanied this release, for the first time defendants also publicly commented on the Company's July 2002 $14.8 million reserve reversal, for a reserve originally taken in January 2002, utilized in the second quarter of fiscal 2002. During the call, however, defendants dismissed the significance of this accounting mechanization, claiming that the "profit and loss impact" on Michaels Stores was zero. At least one analyst who called into the conference call vehemently disagreed, and directly accused Company insiders of trading their Michaels Stores shares while in possession of material adverse non-public information. The analyst, Dan Farb of Highfield Capital, first said it raised serious questions that defendants had taken such a "reserve reversal" in the second quarter 2002 and had not even mentioned it until the conference call which followed the insiders' sale of over $15.3 million of Company stock. More specifically, Farb stated that this undisclosed reversal of the prior accrual would have had the effect of artificially inflating the gross margins of goods during the second quarter, since the margin on the incremental piece of inventory which was liquidated to offset the reserve effectively had a zero cost basis, and this added 100% to margin improvement. This was improper because it allowed defendants to create the materially false impression that the Company had achieved record results in the fiscal second quarter, when, at that time, Michaels Stores was *already* suffering from the same adverse market conditions as were most if not all retailers.

54.     Contrary to defendants' false representations, they had no secret formula for success in a down market, other than misrepresenting the financial condition of the Company for at least one fiscal quarter, so that the insiders could bail out with huge cash cushions. Remarkably, however, when asked by the analysts why defendants had failed to disclose this material "reversal" until the following quarter conference call, one defendant simply stated, "I don't know." Defendants did protest, however, that there was no correlation between the massive insider selling and the failure to disclose this material adverse event. Instead, defendants spouted some nonsense about how, since much of the executives' wealth was tied up in options and since those options would expire in June of 2003 and could only be exercised and sold during certain "windows," the insiders had to sell their

- 23 -

stock. How reasonable. Except for the fact that this explanation simply dismisses the fact that defendants sold their stock while in possession of material adverse non-public information – which is illegal.

55.     In fact, as ridiculous as this statement is, it provides insight into defendants' motive for selling their stock when they did. Since the options expired within months, and since there were only certain periods when Company insiders could sell their stock, defendants did everything possible to inflate and maintain the price of Michaels Stores stock at artificial levels throughout the Class Period so as to allow them to liquidate their private holdings before the price of the Company's stock deteriorated and eroded. And while defendants could reap millions of dollars more in exchange for their Company shares.

56.     Immediately after the defendants made their announcement and hosted this conference call, Merrill Lynch downgraded its rating on shares of Michaels Stores to "neutral" from "buy." Analyst Douglas Neviera said in a research note that "[t]he traffic decline is concerning as we enter the peak holiday season given that seasonal margins could be at greater risk if traffic levels are below expectations and stores must resort to greater markdowns." Neviera reduced his EPS estimate for the Company for 2002 to $2.00 from $2.17 and to $2.40 from $2.55 in 2003.

57.     The market for Michaels Stores common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Michaels Stores common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Michaels Stores common stock relying upon the integrity of the market price of Michaels Stores common stock and market information relating to Michaels Stores, and have been damaged thereby.

58.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Michaels Stores common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

- 24 -

59.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Michaels Stores' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Michaels Stores and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### ADDITIONAL SCIENTER ALLEGATIONS

60.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Michaels Stores, their control over, and/or receipt and/or modification of Michaels Stores' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Michaels Stores, participated in the fraudulent scheme alleged herein.

61.     In addition, the insider trading of the Selling Defendants, many if not all of whom were high-level senior executives or directors of Michaels Stores, further evidences defendants' motive to perpetrate the fraudulent scheme detailed herein.  The chart below details the insider trading, which occurred during the Class Period, as follows:

- 25 -

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **DECARO** | 09/03/02 | 34,999 | $ 45.210 | $ 1,582,305 |
| | | **34,999** | | **$ 1,582,305** |
| **HIEMENZ** | 09/04/02 | 1,000 | $ 46.050 | $      46,050 |
| | 09/04/02 | 49,002 | $ 46.000 | $ 2,254,092 |
| | 09/06/02 | 11,666 | $ 47.000 | $    548,302 |
| | | **61,668** | | **$ 2,848,444** |
| **MARCUS** | 10/15/02 | 4,500 | $ 42.800 | $    192,600 |
| | 10/15/02 | 20,000 | $ 42.900 | $    858,000 |
| | 10/15/02 | 500 | $ 42.820 | $      21,410 |
| | 10/16/02 | 200 | $ 42.000 | $        8,400 |
| | 10/17/02 | 5,000 | $ 42.600 | $    213,000 |
| | 10/17/02 | 6,100 | $ 42.300 | $    258,030 |
| | 10/17/02 | 5,000 | $ 42.620 | $    213,100 |
| | 10/17/02 | 4,800 | $ 42.990 | $    206,352 |
| | 10/17/02 | 3,900 | $ 42.340 | $    165,126 |
| | | **50,000** | | **$ 2,136,018** |
| **ROULEAU** | 09/04/02 | 4,200 | $ 46.100 | $    193,620 |
| | 09/04/02 | 21,900 | $ 46.000 | $ 1,007,400 |
| | 09/04/02 | 2,000 | $ 46.090 | $      92,180 |
| | 09/04/02 | 3,600 | $ 46.070 | $    165,852 |
| | 09/04/02 | 2,000 | $ 46.140 | $      92,280 |
| | 09/04/02 | 3,000 | $ 46.200 | $    138,600 |
| | 09/04/02 | 500 | $ 46.060 | $      23,030 |
| | 09/04/02 | 4,100 | $ 46.010 | $    188,641 |
| | 09/04/02 | 200 | $ 46.020 | $        9,204 |
| | 09/04/02 | 1,000 | $ 46.110 | $      46,110 |
| | 09/04/02 | 2,800 | $ 46.080 | $    129,024 |
| | 09/04/02 | 2,200 | $ 46.040 | $    101,288 |
| | 09/04/02 | 2,500 | $ 46.030 | $    115,075 |
| | 09/06/02 | 7,500 | $ 48.450 | $    363,375 |
| | 09/06/02 | 1,200 | $ 48.370 | $      58,044 |
| | 09/06/02 | 4,900 | $ 48.010 | $    235,249 |
| | 09/06/02 | 2,200 | $ 47.510 | $    104,522 |
| | 09/06/02 | 2,500 | $ 48.170 | $    120,425 |
| | 09/06/02 | 5,000 | $ 48.250 | $    241,250 |
| | 09/06/02 | 10,100 | $ 48.000 | $    484,800 |
| | 09/06/02 | 100 | $ 47.580 | $        4,758 |
| | 09/06/02 | 200 | $ 47.530 | $        9,506 |
| | 09/06/02 | 3,200 | $ 48.350 | $    154,720 |
| | 09/06/02 | 2,500 | $ 47.750 | $    119,375 |
| | 09/06/02 | 10,000 | $ 47.950 | $    479,500 |
| | 09/06/02 | 600 | $ 48.360 | $      29,016 |
| | 10/18/02 | 400 | $ 45.050 | $      18,020 |
| | 10/18/02 | 5,800 | $ 45.100 | $    261,580 |
| | 10/18/02 | 1,500 | $ 45.150 | $      67,725 |
| | 10/18/02 | 1,000 | $ 45.160 | $      45,160 |
| | 10/18/02 | 400 | $ 45.110 | $      18,044 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 10/18/02 | 1,500 | $ 45.120 | $ 67,680 |
| | 10/18/02 | 9,400 | $ 45.020 | $ 423,188 |
| | 10/18/02 | 5,000 | $ 45.040 | $ 225,200 |
| | | **125,000** | | **$ 5,833,441** |
| | | | | |
| **SADLER** | 10/21/02 | 2,500 | $ 46.200 | $ 115,500 |
| | 10/21/02 | 100 | $ 46.120 | $ 4,612 |
| | 10/21/02 | 600 | $ 46.010 | $ 27,606 |
| | 10/21/02 | 100 | $ 46.150 | $ 4,615 |
| | 10/21/02 | 15,700 | $ 46.000 | $ 722,200 |
| | 10/21/02 | 300 | $ 46.140 | $ 13,842 |
| | 10/21/02 | 300 | $ 46.130 | $ 13,839 |
| | 10/21/02 | 400 | $ 46.050 | $ 18,420 |
| | | **20,000** | | **$ 920,634** |
| | | | | |
| **SPENCER** | 09/03/02 | 2,000 | $ 45.270 | $ 90,540 |
| | 09/05/02 | 2,000 | $ 46.250 | $ 92,500 |
| | 09/06/02 | 2,000 | $ 47.250 | $ 94,500 |
| | 09/09/02 | 2,000 | $ 48.250 | $ 96,500 |
| | 09/11/02 | 2,166 | $ 49.330 | $ 106,849 |
| | | **10,166** | | **$ 480,889** |
| | | | | |
| **TUCKER** | 10/21/02 | 33,333 | $ 45.540 | $ 1,517,985 |
| | | **33,333** | | **$ 1,517,985** |
| | | | | |
| **Grand Total:** | | **335,166** | | **$15,319,716** |

62.     In addition, such stock sales by the Selling Defendants during the Class Period were highly unusual and further demonstrate defendants' scienter, because they represent very large, and in some cases 100%, of the stock which was owned by such Selling Defendants during that time and, in addition, such sales were unusual because they represented much larger sales than in similar periods the prior year, as is indicated below:

11/01-8/02

| Defendant | Holdings | Pre-Class Sales | Class Sales | % of Hldgs Sold |
|-----------|----------|-----------------|-------------|-----------------|
| T. DeCaro | 34,999 | 0 | 34,999 | 100.00% |
| D. Hiemenz | 68,465 | 33.332 | 61,668 | 90.07% |
| R. Marcus | 120,000 | 15,000 | 50,000 | 41.67% |
| M. Rouleau | 466,518 | 28,168 | 125,000 | 26.79% |
| E. Sadler | 79,166 | 10,000 | 20,000 | 25.26% |
| R. Spencer | 10,166 | 1,500 | 10,166 | 100.00% |
| J. Tucker | 52,403 | 0 | 33,333 | 63.61% |

63.     The chart below demonstrates the fact that the timing of defendant DeCaro's pre-Class Period sales was far exceeded by the sudden urgency with which defendant DeCaro unloaded his shares during the Class Period, as follows:



**Michaels Stores, Inc.**

## T. Decaro's Monthly Sales History (Share Volume)
## November 2000 - November 2002

64.     The chart below demonstrates the fact that the timing of defendant Hiemenz's pre-Class Period sales was far exceeded by the sudden urgency with which defendant Hiemenz unloaded his shares during the Class Period, as follows:

# Michaels Stores, Inc.
## D. Hiemenz's Monthly Sales History (Share Volume)
## November 2000 - November 2002



65.     The chart below demonstrates the fact that the timing of defendant Marcus' pre-Class Period sales was far exceeded by the sudden urgency with which defendant Marcus unloaded his shares during the Class Period, as follows:



## Michaels Stores, Inc.
### R. Marcus' Monthly Sales History (Share Volume)
### November 2000 - November 2002

66.     The chart below demonstrates the fact that the timing of defendant Rouleau's pre-Class Period sales was far exceeded by the sudden urgency with which defendant Rouleau unloaded his shares during the Class Period, as follows:

- 30 -



**Michaels Stores, Inc.**

## M. Rouleau's Monthly Sales History (Share Volume)
### November 2000 - November 2002

67.    The chart below demonstrates the fact that the timing of defendant Sadler's pre-Class Period sales was far exceeded by the sudden urgency with which defendant Sadler unloaded his shares during the Class Period, as follows:

- 31 -

## Michaels Stores, Inc.
### E. Sadler's Monthly Sales History (Share Volume)
### November 2000 - November 2002



68.     The chart below demonstrates the fact that the timing of defendant Spencer's pre-Class Period sales was far exceeded by the sudden urgency with which defendant Spencer unloaded his shares during the Class Period, as follows:

- 32 -

## Michaels Stores, Inc.

### R. Spencer's Monthly Sales History (Share Volume)
### November 2000 - November 2002



69.     The chart below demonstrates the fact that the timing of defendant Tucker's pre-Class Period sales was far exceeded by the sudden urgency with which defendant Tucker unloaded his shares during the Class Period, as follows:

# Michaels Stores, Inc.

## J. Tucker's Monthly Sales History (Share Volume)
## November 2000 - November 2002



## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

70.     At all relevant times, the market for Michaels Stores common stock was an efficient market for the following reasons, among others:

(a)     Michaels Stores stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Michaels Stores filed periodic public reports with the SEC and the NYSE;

(c)     Michaels Stores regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Michaels Stores was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

- 34 -

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

71.    As a result of the foregoing, the market for Michaels Stores common stock promptly digested current information regarding Michaels Stores from all publicly available sources and reflected such information in Michaels Stores' stock price. Under these circumstances, all purchasers of Michaels Stores common stock during the Class Period suffered similar injury through their purchase of Michaels Stores common stock at artificially inflated prices and a presumption of reliance applies.

### FIRST CLAIM FOR RELIEF

#### For Violation of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

72.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable the Selling Defendants to sell more than $15.3 million of their personally held Michaels Stores common stock to the unsuspecting public; and (iii) cause plaintiff and other members of the Class to purchase Michaels Stores common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

74.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Michaels Stores common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

- 35 -

75.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Michaels Stores as specified herein.

76.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Michaels Stores' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Michaels Stores and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Michaels Stores common stock during the Class Period.

77.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

78.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Michaels Stores' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

79.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Michaels Stores common stock was artificially inflated during the Class Period. In ignorance of the fact that market price of Michaels Stores common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Michaels Stores common stock during the Class Period at artificially high prices and were damaged thereby.

80.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Michaels Stores was experiencing, which was not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Michaels Stores stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

81.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

- 37 -

82.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violation of Section 20(a) of the Exchange Act
Against Defendants DeCordova and Rouleau**

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     Defendants DeCordova and Rouleau acted as controlling persons of Michaels Stores within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Defendants DeCordova and Rouleau were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

86.     As set forth above, Michaels Stores and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants DeCordova and Rouleau are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and

other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 4, 2003                    PROVOST & UMPHREY LAW FIRM, LLP
                                           JOE KENDALL
                                           State Bar No. 11260700


                                           _Joe Kendall_ _by permission_
                                           _____  DB
                                                JOE KENDALL

                                           3232 McKinney Avenue, Suite 700
                                           Dallas, TX 75204
                                           Telephone: 214/744-3000
                                           214/744-3015 (fax)

- 39 -

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

SCOTT & SCOTT, LLC
DAVID R. SCOTT
MICHAEL A. SWICK
KAREN LESER
108 Norwich Avenue
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)

CAULEY, GELLER, BOWMAN
  & COATES, LLP
PAUL J. GELLER
One Boca Place, Suite 421A
2255 Glades Road
Boca Raton, FL  33431
Telephone:  561/750-3000
561/750-3364 (fax)

DeCARLO, CONNOR & SELVO
JOHN T. DeCARLO
533 South Fremont Avenue, 9th Floor
Los Angeles, CA 90071-1706
Telephone: 213/488-4100
213/488-4180 (fax)

Attorneys for Plaintiff